{¶ 81}
 {¶ 82} This action was before the trial court upon a motion for summary judgment filed by plaintiff, Columbus Mortgage, Inc. ("CMI"), which motion the trial court sustained. Defendant, Kevin Morton, appealed raising four assignments of error. Since I would *Page 32 
sustain the first assignment of error, and find assignments of error two, three, and four to be moot as a result, I cannot concur in the majority opinion and must respectfully dissent.
 {¶ 83} Since the case involves a decision upon summary judgment, the review by this court is de novo. In considering a motion for summary judgment, Civ.R. 56 requires an Ohio court to construe the evidence most strongly in favor of the non-moving party. When the evidence is so construed there are genuine issues of material fact, which precludes granting summary judgment to CMI. In making this determination, neither the trial court nor this court may weigh the evidence or give greater weight to the evidence of one party because it seems to be more credible than that of the other party. Here, the evidence, when construed most strongly in favor of Morton, demonstrates that he went to the business place of CMI on which automobiles were displayed for sale much the same as any used car lot with the express intent to buy an automobile because he had no transportation at the time. Morton looked over the automobiles on the lot and found a 1994 Cadillac Concourse, with a purchase price of $4,995, which he liked. When a CMI salesperson approached him, Morton told the salesperson he wanted to buy the Cadillac and after the salesperson made certain of the agreements that certain repairs would be made to the Cadillac, it was agreed that CMI would sell the vehicle to Morton, and that Morton would purchase it, making a $500 down payment, and financing the remainder. At this point, however, the salesperson indicated that CMI would finance the balance of the purchase price for Morton. Thus, there were two transactions between CMI and Morton. The first was a purchase contract to purchase the automobile. The second was *Page 33 
a loan arrangement to finance the balance of the $4,995 purchase price plus tax after Morton's down payment of $500. In Glouster Comm. Bank v.Winchell (1995), 103 Ohio App.3d 256, 659 N.E.2d 330, the Fourth District Court of Appeals held that, under similar circumstances where a financial institution first sells a vehicle to a consumer and then finances the purchase price, the sale portion of the two transactions is subject to the Retail Installment Sales Act ("RISA") because the court held that, even though RISA exempted financial institutions from the definition of the consumer transaction, the financial institution was subject to RISA because it did not merely lend money to Winchell, but, instead, sold the tangible property which was financed directly to Winchell. In Haines v. Key Oldsmobile Co. (Oct. 28, 1997), Franklin App. No. 97APE06-750, this court distinguished Glouster stating:
 The RISA provision at issue in Glouster, R.C. 1317.01(A), included in its definition of "retail installment sale":
 "* * * ` "[1] every retail installment contract to sell specific goods, [2] every consumer transaction in which the cash price may be paid in installments over a period of time, and [3] every retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time. * * * "`"
 {¶ 84} Hence, while financial institutions were exempt from the definition of consumer transaction, they could be subject to RISA if the transaction fell under either number one or three above. The transaction in Glouster did fall within one of these and therefore the bank was not exempt. In Haines, this court found that the Consumer Sales Practice Act differed from RISA in that it does not contain similar language and, *Page 34 
accordingly, the financial institution would be exempt from the requirements of the Consumers Sales Practice Act.
 {¶ 85} CMI contends that it is exempt from the requirement that a dealer selling motor vehicles must be licensed, pursuant to R.C. Chapter 4517, because it sells only vehicles which it has repossessed but then admits it sells some automobiles which it has taken as a trade-in and resells some automobiles after they have been taken back from a purchaser in exchange for a purchase of a different automobile.
 {¶ 86} CMI presented the affidavit statement of its employee, Dennis, who stated that CMI did not sell more than five trade-in vehicles a year. This, however, is evidence that CMI sold more than one automobile per year that was not repossessed. R.C. 4517.02(C) provides that sections 4517.01 to 4517.45 of the Ohio Revised Code do not apply to any of the following: "(2) mortgagees selling at retail only those motor vehicles that have come into their possession by a default in the terms of a mortgage contract." (Emphasis added.) The word "only" in the statute means if even one motor vehicle that was not repossessed is sold, the exemption does not apply. CMI interprets and urges a construction that removes the word "only" from the statute and gives no meaning to it. If the word "only" were eliminated, the exemption would apply to the sale of repossessed vehicles regardless of the number of non-repossessed vehicles sold. However, every word of a statute must be given meaning. By selling some automobiles which were not repossessed, CMI loses the exemption which it would have had had it sold no vehicles which it had not repossessed. R.C. 4517.02(A)(6) states a seller of "more than five *Page 35 
casual sales of motor vehicles in a twelve-month period," is required to be licensed as a dealer. However, there is no evidence that the sales of non-repossessed motor vehicles by CMI were "casual sales." Accordingly, there is a genuine issue of material fact as to whether CMI was required to obtain a license as required by R.C. 4517.02(A)(2).
 {¶ 87} With respect to the usury claim, CMI presented an affidavit of a person with 27 years of experience and training in the automobile industry who opined that the interest rate charge was no more than 23 percent, even though it was stated to be 26.02 percent. He indicated that the difference was the charge of an origination fee of $200, which was permitted by R.C. 1321.57. However, both the note and security agreement executed by the parties, with respect to the loan, indicated in a box labeled annual percentage rate, preceding the words "the loan finance charge rate is 23.00% annum." However, in the agreement after the words "maximum charge" are the following: "shall not exceed twenty-one per centum per annum calculated on the actuarial method." The reason for this statement of the 21 percent interest rate is probably because of the limitation upon CMI by the Ohio Mortgage Loan Act, which permits a charge of a loan origination fee in addition to the maximum interest rate of 21 percent. R.C. 1321.57(A). Although there is another section of the Ohio Revised Code (R.C. 1321.571),[1] which permits the charge of up to 25 percent interest "[a]s an alternative to the interest permitted in division (A) of section 1321.57[,]" R.C. 1321.571 does not contain a provision permitting the charge of a loan origination fee in addition to the maximum of 25 percent interest. *Page 36 
 {¶ 88} When the evidence is construed most strongly in favor of the non-moving party, Morton, there are genuine issues of material fact with respect to the interest rate charged Morton by CM I.
 {¶ 89} Also, with respect to the sale of the Cadillac after Morton turned it in, and it was "repossessed" by CMI, there are genuine issues of material fact regarding the commercial reasonableness of the sale. The burden of persuasion with respect to commercial reasonableness, as well as with respect to the contention of exemption, is upon the person claiming the exemption and the person claiming the sale to be commercially reasonable. The deposition testimony concerning the sale of the Cadillac by CMI after "repossession" is unclear and confusing. There is little indication that the Cadillac was ever for sale, except as a private transaction, since there is evidence that it never was on the sales lot because it was in need of repair or was being repaired. In the short time that Morton had possession of the vehicle (no more than eight months), the vehicle needed multiple repairs including replacement of the brakes, replacement of the transmission, and replacement of the engine. Morton repaired the brakes and replaced the transmission (the cost of which was added to the loan from CMI through a second loan), but could not afford the cost of replacing the engine.
 {¶ 90} Morton paid $4,995 plus tax for the vehicle when he purchased it in February 2004, and has spent more than $2,000 in repairs before the engine gave out and he returned it to CMI for repossession. CMI then expended more than $3,000 to replace the engine before it sold it at a private sale. After all these repairs and *Page 37 
replacements, the sale price was approximately the same as Morton had paid when he purchased the Cadillac "as is" for nearly $5,000 only months earlier. Nevertheless, CMI "allowed" $2,000 off the amount still owed by Morton on the note. In other words, a vehicle sold "as is" in February 2004, with many mechanical problems, six months later was sold for approximately the same price after replacement of the brakes, transmission, and motor at a private sale for approximately the same price that Morton had paid for the vehicle "as is." Under the circumstances, there are genuine issues of material fact as to the commercial reasonableness of this resale by CMI. Accordingly, the first assignment of error is well-taken. In light of the first assignment of error being well-taken, the other three assignments of error are essentially moot and need not be addressed. Accordingly, I would sustain the first assignment of error for the reasons stated above, would find the remaining three assignments of error to be moot, and would reverse the judgment of the Franklin County Court of Common Pleas and would remand this case to that court for further proceedings.
 {¶ 91} __________________________
 {¶ 92}
[1] R.C. 1321.571 was repealed but a subsequent action of the General Assembly "repealed" the repeal. We need not determine the effectiveness of the repeal of the repeal. *Page 1